**FILED**
CLERK, U.S. DISTRICT COURT
May 16, 2005 (3:18pm)
DISTRICT OF UTAH

IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br><br><br><br><br>vs.<br><br><br>RAUL ENRIQUE PEREZ-CHAVEZ<br><br>Defendant. | ORDER AND MEMORANDUM OPINION REGARDING DOWNWARD DEPARTURE FOR DISPARITY CREATED BY "FAST-TRACK" PROGRAM AND FOR OTHER REASONS<br><br><br><br><br><br>Case No. 2:05-CR-00003PGC |

Should a defendant arrested in Utah serve a longer prison term than a defendant arrested in Arizona for the identical crime?  That is the issue pending before the court as a result of various "fast-track" programs for the rapid disposition of illegal re-entry cases.  Under these programs, a defendant arrested for illegal re-entry in the District of Arizona, the Southern District of California, or other "fast-track" jurisdictions who enters a rapid guilty plea is given a shorter sentence than otherwise called for by the Sentencing Guidelines.   Because this sentence disparity is troubling, the court has raised the issue of whether the defendant here – Mr. Raul Enrique Perez-Chavez – should be eligible to receive the same shorter sentence that would result in a fast-track jurisdiction.

Having received capable argument from both sides on this question, the court reluctantly concludes that it cannot vary from the Guidelines and give Mr. Perez-Chavez the shorter sentence he would receive in Arizona and other fast-track districts. To do so would be to ignore the recent congressional directive, contained in the PROTECT Act, that only the Attorney General can authorize fast-track programs. This command is now reflected in the Sentencing Guidelines themselves, which provide for the downward adjustments under Attorney General-approved fast-track programs, but not elsewhere. Moreover, while these programs clearly result in sentencing disparity between similarly-situated offenders, they also assist the Department of Justice (and the courts) in quickly processing large numbers of illegal re-entry cases. Congress could reasonably conclude that these benefits outweigh the attendant disparities in sentencing. Finally, nothing in the Constitution prohibits different sentences resulting from fast-track programs, as these differences arise from prosecutorial discretion rather than invidious discrimination. For all these reasons, the court will apply the Sentencing Guidelines in this case and not vary downward to attempt to match fast-track dispositions that might be available in other jurisdictions.

At the same time, however, the court encourages the Justice Department to attempt to minimize the disparities caused by these programs. In the court's view, the Department should consider whether to extend these programs across the country rather than applying them in a few selected districts. Based on the information that has been presented in this case, it is hard to see any real justification for having fast track programs in only selected jurisdictions.

While a fast-track adjustment is not appropriate in this case, Mr. Perez-Chavez has also moved for a downward departure based on the extraordinary family circumstances that prompted his illegal re-entry into the country.  This argument is well-founded and the court will accordingly depart downward from the Guidelines for this reason.

### FACTUAL BACKGROUND

The compelling facts of this case are essentially undisputed.  The defendant, Raul Enrique Perez-Chavez, was born on April 13, 1978, in Tijuana, Mexico.  Ever since he was two years old, he has had a passport and visa to visit the United States and has visited the United States frequently.  In 1996, Mr. Perez-Chavez began a relationship with his common law wife, Mayra Wong-Valencia.  In 1998, he began living in the United States, and they had three boys together.

On March 20, 2003 Mr. Perez-Chavez and his wife were deported to Mexico.  They had three children, all boys, Luis Raul, Christian Andre, and Carlos David, then ages five, four, and one respectively.  Each of the boys had been born by Caesarean section and were United States citizens by virtue of having been born in this country.

Soon after the deportation, Ms. Garcia-Wong became pregnant.  During the next five months, she received medical care at a local Mexican clinic.  Unfortunately, she developed severe health problems for a variety of reasons, including the closeness of her previous pregnancies, the fact that all had been concluded by Caesarean section, and the gestational diabetes she developed with every pregnancy.  Her condition worsened to the point that she could not care for the children.  Mr. Perez-Chavez was working to support the family, so Ms. Garcia-Wong sent her two oldest boys back to Utah to be cared for by their grandmother.  Ms. Garcia-

Wong's condition continued to deteriorate to the point that she was referred to a gynecologist, who told Ms. Garcia-Wong that both her life and the life of her unborn child were in danger and that the only chance for her baby was to return to the United States to receive appropriate medical care.

Afraid for her unborn child's life, Ms. Garcia-Wong returned reluctantly to the United States in November 2003.  Less than a week after her return to Salt Lake City, she was admitted to the University of Utah Hospital for an emergency Caesarean.  On November 24, 2003, her baby, Angel, was born three months premature.  Angel weighed less than three pounds and suffered from underdeveloped lungs as well as the RSV virus.  Angel remained hospitalized for one month before being released, and received treatment for RSV for five or six months thereafter.

Ms. Garcia-Wong remained in the United States for a few more months to allow Angel's health to continue to improve.  In October 2004, she prepared to return to Mexico to rejoin her husband, Mr. Perez-Chavez, who had remained in Mexico this entire time rather than reenter the United States illegally.  Just as Ms. Garcia-Wong was preparing to leave, her grandfather became terminally ill with lung and liver cancer.  Her mother could not care for him, so the responsibility fell on Ms. Garcia-Wong's shoulders.  Having to care for her own children (including Angel, whose health remained in a delicate condition) and her grandfather became too much for Ms. Garcia-Wong, and she reached a breaking point.  She called Mr. Perez-Chavez and told him that she desperately needed his help.  By this time, he had been separated from his wife for one year. He reluctantly agreed to return, doing so only to help his wife with responsibilities that were

threatening to overwhelm her.  He entered the country illegally on November 1, 2004.  His wife's grandfather died three weeks later.  On December 16, 2004, Mr. Perez-Chavez and his wife were stopped in Utah for speeding and were arrested and indicted on the offense now before the court – violation of 8 U.S.C. § 1326, re-entry by a previously deported alien.

Ms. Garcia-Wong's case has been resolved.  She pled guilty and both the government and defense counsel moved for a downward departure from the Guidelines in view of the unusual circumstances of her case.  The court granted the motion and imposed a sentence of time served, remanding her to the Bureau of Immigrations and Customs Enforcement for deportation proceedings.

Mr. Perez-Chavez has also pled guilty and has requested that his sentence be adjusted downward to account for the disparity created by the fast-track program, or because of other extraordinary circumstances of this case.

## FAST-TRACK PROGRAMS

Before turning to the details of Mr. Perez-Chavez's case, a brief review of fast-track programs is in order.[1]  Both sides agree that Mr. Perez-Chavez will serve a significantly longer prison sentence under the Sentencing Guidelines because he was arrested in Utah rather than in, for example, Arizona.  This disparity stems from so-called "fast-track" disposition programs under which prosecutors offer immigration offenders like Mr. Perez-Chavez a reduced sentence

---

[1] *See generally* Erin T. Middleton, *Fast-Track to Disparity: How Federal Sentencing Polices Along the Southwest Border are Undermining the Sentencing Guidelines and Violating Equal Protection*, 2004 UTAH L. REV. 827 (providing an excellent overview of fast-track programs).

in exchange for an expeditious guilty plea.  "The premise on which fast track programs are based

is that defendants who promptly agree to participate in such a program save the government

significant scarce resources that can be used in prosecuting other defendants and demonstrate

[extraordinary] acceptance of responsibility . . . ."[2]  In recent years, fast-track programs of one

form or another existed in approximately one-half of the judicial districts in the United States.[3]

  While these programs have existed for some time, they were not statutorily recognized

until the PROTECT Act of 2003, in which Congress specifically granted the Attorney General

the authority to create early disposition or "fast-track" programs.[4]  Under the Act, individual U.S.

Attorney's Offices must petition the Attorney General for permission to adopt such a program.

Interestingly, in 2004, the U.S. Attorney for the District of Utah requested authorization from the

Attorney General to implement a fast-track program for immigration cases in Utah, but the

Attorney General denied the request.  Neither the reasons for the application nor the reasons for

the denial are in the public record.

  Because Utah does not have a fast-track program, Mr. Perez-Chavez will receive a longer

sentence than he would in a district such as the District of Arizona.  Under the applicable 2004

*Guidelines Manual*, the base offense level for an 8 U.S.C. § 1326 offense is eight.[5]  Because Mr.

---

[2]  U.S. Sentencing Comm'n Report to the Congress: Downward Departures from the
Federal Sentencing Guidelines 15 (Oct. 2003) (*available at*
http://www.ussc.gov/departrpt03/departrpt03.pdf) (hereinafter "Departures Report").

[3]  *Id*. at 66.

[4]  Pub. L. No. 108-21, 117 Stat. 65.

[5]  U.S.S.G. § 2L1.2.

Perez-Chavez was previously deported after conviction of Possession of a Controlled Substance, the base offense level is enhanced eight levels, resulting in an adjusted base offense level of 16.[6] Because of the prior conviction which led to Mr. Perez-Chavez's first deportation, and the fact that his re-entry occurred less than two years after being released and while still on probation, Mr. Perez-Chavez has a criminal history score of five, which places him in criminal history category III.[7]  After credit for a three-level reduction for acceptance of responsibility, the result is a recommended Guidelines sentence of 18-24 months in prison.  Had Mr. Perez-Chavez been arrested in the District of Arizona, he apparently would have received a further three-level reduction under the fast-track program,[8] producing a recommended range of 10-16 months.  This kind of lower sentence is apparently typical of other fast-track programs.[9]

## VARYING FROM THE GUIDELINES TO REFLECT FAST-TRACK PROGRAMS

### A.  The Purposes of Sentencing

Before turning to the specifics of Mr. Perez-Chavez's claim, it is useful to briefly set out the approach the court must follow in determining a sentence.   The Supreme Court's recent decision in *United States v. Booker*[10] renders the Sentencing Guidelines "advisory."  In other words, the court is now required to *consider* the Guidelines in imposing a sentence but is not

---

[6]  U.S.S.G. § 2L1.2(b)(1)©.

[7]  U.S.S.G. § 5A.

[8]  Defendant's Sentencing Memo. at 13.

[9]  *See* Appendix A (listing other fast-track programs).

[10]  125 S.Ct. 738 (2005).

obligated to impose a Guidelines sentence.  *Booker* also directs that the court must consider the other congressionally-mandated purposes of punishment in determining a sentence.  Congress has directed that criminal sentences must achieve four purposes:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

In addition, the Act directs that the court must consider "the need to avoid unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct."[11]   Finally, the Act requires that the sentence shall be "no greater than necessary . . . to comply with the purposes of punishment . . . ."[12]

This court has previously held that in all but the most unusual circumstances, the recommended Guidelines sentence will still be the most appropriate sentence.  This is because the manner in which the Guidelines have been developed strongly suggests that in almost all cases the proposed Guidelines sentence will faithfully reflect the purposes of sentencing.  Indeed, in *United States v. Wilson*,[13] this court explained:

> It would be startling to discover that while Congress had created an expert agency, approved the agency's members, directed the agency to promulgate Guidelines, allowed those Guidelines to go into effect, and adjusted those Guidelines over a period of fifteen years, that the resulting Guidelines did not well serve the underlying congressional purposes.  The more likely conclusion is that

---

[11] 18 U.S.C. § 3553(a)(2), (6).

[12]  18 U.S.C. § 3553(a).

[13]  350 F. Supp. 2d 910 (D. Utah 2005).

the Guidelines reflect precisely what Congress believes is the punishment that will achieve its purposes in passing criminal statutes.[14]

This court's general approach is, therefore, to impose a Guidelines sentence unless a strong reason is shown for a different sentence.[15]  It must be remembered that the Guidelines themselves provide for "departures" from the Guidelines in unusual situations that stand outside of the heartland of the Guidelines.[16]  In addition, because the Guidelines are no longer mandatory, a strong reason might justify "varying"[17] from the Guidelines to serve the purposes of punishment set forth in § 3553, even when there is not a basis for a traditional departure.  But as explained in *Wilson*, a variance from the proposed Guidelines sentence would only be appropriate "in unusual cases for clearly identified and persuasive reasons."[18]

### B.  "Unwarranted" Disparity and Fast-Track Programs

In this case, Mr. Perez-Chavez seeks a variance from the Guidelines by arguing that the existence and use of fast-track programs in other jurisdictions undermines the purposes of the Sentencing Reform Act set forth in § 3553.  Specifically, Mr. Perez-Chavez argues that the use of

---

[14]  *Id*. at 915.

[15]  *Id.* at 911; *accord United States v. Wanning*, 354 F. Supp. 2d 1056 (D. Neb. 2005); *United States v. Crosby*, 397 F.3d 103 (2nd Cir. 2005); *United States v. Peach*, 356 F. Supp. 2d 1018 (D.N.D. 2005); but *cf. United States v. Myers*, 353 F. Supp. 2d 1026 (S.D. Iowa 2005); *United States v. Ranum*, 353 F. Supp. 2d 984 (E.D. Wisc. 2005); *Simon v. United States*, 361 F. Supp. 2d 35 (E.D.N.Y. 2005); *United States v. Biheiri*, 356 F. Supp. 2d 589 (E.D. Va. 2005); *United States v. Jabor*, 362 F.Supp.2d 365 (D. Mass. 2005).

[16]  *See* U.S.S.G. § 5K2.0.

[17]  *United States v. Wilson*, 355 F. Supp. 2d 1269, 1272 (D. Utah 2005) (discussing "departure" versus "variance" terminology).

[18]  *Wilson*, 350 F. 2d at 911.

fast-track dispositions in so many illegal re-entry cases solely for purposes of expediency demonstrates that the actual Guidelines sentence is "greater than necessary" to achieve the purposes of sentencing.  He also argues that the resulting disparity for defendants in jurisdictions where fast-track is not available undermines the primary goal of the Sentencing Reform Act, which was to reduce "unwarranted disparity" between similarly-situated offenders.  In short, Mr. Perez-Chavez argues that this is one of those unusual cases where the Guidelines do not accurately reflect the purposes of sentencing set forth by Congress, and that by specifically recognizing and ratifying fast-track programs "the Sentencing Commission has promulgated a Guideline provision that defeats the purpose of the Guidelines itself . . . ."[19]

### United States v. Armenta-Castro

This argument immediately encounters serious difficulties.  Most important for this district court is the Tenth Circuit's previous holding that the disparity caused by fast-track programs does not justify a downward departure under the Guidelines.  In 2000 in *United States v. Armenta-Castro*,[20] the Circuit stated the issue as follows: "[D]oes the existence of sentencing disparities as to illegal re-entry cases among the various federal districts, where such disparities arise from varying charging and plea-bargaining policies of the individual United States Attorneys, provide an appropriate basis for a downward departure at sentencing?"[21]  While recognizing that one of the primary goals of the Sentencing Reform Act of 1984 was to eliminate

---

[19]  Supplemental Memo. at 9.

[20]  227 F.3d 1255 (10th Cir. 2000).

[21]  *Id.* at 1257.

unwarranted disparities, the Circuit held that this goal could not be achieved at the expense of specific provisions of the Sentencing Guidelines and that "the governing provisions of the United States Code and the Sentencing Guidelines categorically proscribe the consideration of sentencing disparities flowing from the exercise of prosecutorial discretion in charging and plea bargaining practices."[22]   The Circuit explained that disparities caused by prosecutorial discretion had already been adequately considered in formulating the Guidelines and therefore could not be considered a mitigating factor.[23]   Moreover, the Circuit found that departure analysis must be tied to the specific facts of the case at hand.[24]   The sentencing policies of other districts, the court held, are irrelevant to whether the facts of a particular case would justify a departure. "Extraneous" factors, such as the sentencing policies of other districts, are not part of the uniformity sought by the Guidelines.[25]   The Tenth Circuit, therefore, held that a *departure* from the Guidelines is not available to ameliorate fast-track disparity.[26]

### Nationwide Fast-Track Programs and Booker

In light of *Armenta-Castro*, it would seem that Mr. Perez-Chavez's claim has already been rejected by the Tenth Circuit.  But Mr. Perez-Chavez contends that two developments since

---

[22]  *Armenta-Castro*, 227 F.3d at 1258.

[23]  *Id.*

[24]  *Id.*

[25]  *Id.* at 1260 (quoting *United States v. Banuelos-Rodriguez*, 215 F.3d 969, 974 (9th Cir. 2000) (*en banc*).

[26]  *Accord Banuelos-Rodriguez*, 215 F.3d 969; *United States v. Bonnet-Grullon*, 212 F.3d 692 (2nd Cir. 2000), *cert. denied*, 531 U.S. 911 (2000).

*Armenta-Castro* render the decision irrelevant here.  First, Mr. Perez-Chavez argues that *Armenta-Castro* is irrelevant because it presented the different issue of whether the plea-bargaining policies of individual United States Attorneys had been adequately considered in crafting the Guidelines, whereas the current disparity is caused by nationwide resource-allocation decisions of the Attorney General.  Second and more broadly, he claims that because *Booker* rendered the Guidelines advisory instead of mandatory, the court must now consider the purposes of sentencing set forth in § 3553(a) separately instead of as incorporated into the Guidelines.  He argues that imposing the sentence recommended by the Guidelines in this case would undermine § 3553(a) because it would result in a sentence "greater than necessary" to implement the purposes of sentencing, including just punishment, deterrence, and, most important, the need to avoid unwarranted sentence disparity.  While these claims are well-argued by defense counsel, the court does not find either persuasive.  Rather than rendering *Armenta-Castro* irrelevant, the fact that fast-track programs must now be implemented with the Attorney General's approval makes the reasoning of *Armenta-Castro*, if anything, even more persuasive here.  *Armenta-Castro*'s holding rested on the fact that the Guidelines *implicitly* rendered prosecutorial discretion an irrelevant factor for purposes of downward departures.[27]  That reasoning is, of course, much more powerful in the context of the PROTECT Act, which now *explicitly* considers the fast-track issue and spells out how such questions are to be handled.[28]  The Sentencing Commission has directly implemented that Congressional mandate by placing fast-track

---

[27] *Armenta-Castro*, 227 F.3d at 1258.

[28] *See* Pub. L. No. 108-21, 117 Stat. 65.

programs into the Guidelines.  U.S.S.G. § 5K3.1 provides that "upon motion of the Government, the court may depart downward not more than four levels pursuant to an early disposition program authorized by the Attorney General of the United States and the United States Attorney for the district in which the court resides."[29]  Because fast-track programs are now covered by statute and by the Guidelines, the court could give Mr. Perez-Chavez fast-track credit only by disagreeing with the Commission's (and Congress') assessment of how to handle the issue. *Armenta-Castro* suggests that the Commission's approach should be followed, rather than ignored.

The defendant's second and broader argument is that *Armenta-Castro* is irrelevant because the Guidelines are now merely advisory.  At one level, this argument is correct.  *Booker* has rendered the Guidelines advisory, and pre-*Booker* decisions such as *Armenta-Castro* must be read in that light.  More important, however, is that even after *Booker* the court must still "consider" the Guidelines.  This court has held that because the Guidelines will almost always accurately reflect the congressional purposes of punishment, they should still be given "great weight" and generally followed unless a clear and persuasive reason exists for believing that a Guidelines sentence does not implement the congressional purposes of punishment.[30]

Congress plainly believes that fast-track programs are consistent with its purposes of punishment.  Just two years ago in the PROTECT Act, Congress statutorily validated the fast-track approach.  The congressional thinking, while subject to dispute, is easy to understand.

---

[29]  U.S.S.G. § 5K3.1.

[30]  *Wilson*, 350 F. Supp. 2d at 911.

Fast-track programs arguably serve the goal of deterrence by expediting the processing of cases, thereby allowing prosecutors to bring more charges against more immigration offenders than would otherwise be possible.  The number of federal immigration offenses has exploded from 2,300 in fiscal year 1991 to 10,458 in fiscal year 2001.[31]  Moreover, these offenses are concentrated in various districts, typically along the Mexican border.  The Southern District of California alone prosecuted more immigration offenses (4,213) than did the entire Tenth Circuit (3,415).[32]  It stands to reason that some districts may need to find ways to rapidly process immigration cases.  Fast-track programs also arguably reduce disparity by allowing more violators to be prosecuted.  For example, the U.S. Attorney for the Southern District of California has reported that without a fast-track program, the number of immigrant offenders that could be prosecuted along the California-Mexico border would significantly decrease.[33]  This means that while fast-track programs do create disparity between *prosecuted* offenders from district to district; because they permit more prosecutions, they may prevent the even greater disparity that occurs when an offender goes *unprosecuted* because of the lack of prosecutorial resources in a district with a large volume of immigration offenses.

In short, Congress has concluded that the advantages stemming from fast-track programs outweigh their disadvantages, and that any disparity that results from fast-track programs is not "unwarranted."  This court's sentencing task is to faithfully implement the congressional will.

---

[31]  Departures Report, *supra*, at 62.

[32]  *Id. at 62.*

[33]  *Id.* at 66.

Indeed, the whole point of the *Booker* remedial majority was that, so long as it complies with the Constitution, the congressional will governs in sentencing matters.[34]   In this case, that means applying the recommended Guidelines sentence without varying to try and eliminate the disparity caused by fast-track programs.  If Congress is willing to accept that disparity, so must this court.

### Contrary District Court Opinions

In reaching this conclusion, the court is aware of two contrary district court opinions.  In *United States v. Galvez-Barrios*,[35] Judge Adelman of the Eastern District of Wisconsin stated that "it may be appropriate in some cases for courts to exercise their discretion to minimize the sentencing disparity that fast-track programs create."[36]  Similarly, in *United States v. Ramirez-Ramirez*,[37] Judge Lee of the Eastern District of Virginia agreed with Judge Adelman that some adjustment for sentencing disparity resulting from fast-track dispositions was appropriate.

In this court's view, *Galvez-Barrios* and *Ramirez-Ramirez* are well intentioned[38] but wrongly decided.  They create fast-track programs by judicial fiat, circumventing the PROTECT Act requirement that the decision to approve a fast-track program rests in the hands of the Attorney General.  To give Mr. Perez-Chavez a variance from the Guidelines in this case, for

---

[34]   *See Booker*, 125 S.Ct. at 756.

[35]   355 F.Supp. 2d 958 (E.D. Wis. 2005).

[36]   *Id.* at 963.

[37]   – F.Supp. 2d – , 2005 WL 924833 (E.D. Va. April 18, 2005).

[38]   *See* Paul G. Cassell, *Too Severe?: A Defense of the Federal Sentencing Guidelines (and a Critique of the Federal Mandatory Minimums)*, 56 STAN. L. REV. 1017, 1019 (2004) (expressing view that immigration sentences are too severe).

instance, would effectively overturn the Attorney General's decision that Utah does not qualify for a fast-track program.

Moreover, it is not immediately clear that *Galvez-Barrios* and *Ramirez-Ramirez* will reduce sentence disparity. For starters, it is not apparent that all judges even within the Eastern District of Wisconsin or the Eastern District of Virginia are in agreement with the views expressed by Judge Adelman and Judge Lee. If not, then *Galvez-Barrios* and *Ramiez-Ramirez* will create the  unseemly spectacle that a defendant's sentence will depend on which courtroom he happens to find himself in within those districts. And even if all the judges in those districts agreed to unilaterally create their own judicial fast-track program, the sentences in these two districts would then match those given in fast-track districts but would still differ from those in non-fast-track districts.

A judicially-created fast-track program also would require judicial decisions about subjects that are best left to the Executive Branch. For instance, how much of a sentence reduction should a judge give a defendant in order to help process cases expeditiously? Would it be the three-level reduction given some defendants in Arizona? [39]  Or the two-level reduction given in the Southern District of Texas (Brownsville Division).[40] Or the one-level reduction

_____

[39]  *Id.*  (reporting that under the Arizona fast-track program a defendant receives a three-level reduction for an offense level of 16, 20, or 24; a four-level reduction for offense eight or 12 if Criminal History Category I through IV or a two-level reduction if Criminal History Category V or VI).

[40]  *Id.*

given in the Western District of Texas?[41]  Or would it be some other approach entirely, such as

the fixed sentence offered in the Southern District of California?[42]

A court would also have to determine what kinds of offenses would be covered by a fast-

track program.  While the majority of fast-track programs relate to illegal re-entry cases, some

programs also include drug and firearms offenses.[43]

Once a court reaches a determination about how much of a sentencing reduction would be

generally available and what kinds of offenses are covered, it would still have to decide whether

a particular defendant was eligible for a fast-track disposition.  All fast-track programs retain

prosecutorial discretion about admitting defendants to the program,[44] discretion presumably

designed to prevent particularly dangerous defendants from receiving inappropriate leniency.

How courts would make such determinations has not been articulated.  Judge Adelman, for

example, hints at this problem when he holds that "it *may* be appropriate in *some* cases for

courts" to vary downward to reduce fast-track disparity.[45]  This means, of course, that it may be

*in*appropriate in *some* cases to allow a defendant to participate in a fast-track program.  Without

some clear and announced rule for determining which defendants qualify for downward

_____

[41]  *Id.*

[42]  *Id.*

[43]  Government Response to Order Directing Briefing on "Fast Track" Programs in Other Districts at 19.

[44]  *Id.* at 6.

[45]  *Galvez-Barrios*, 355 F. Supp. 2d at 963 (emphases added).

variances, judicially-created fast-track programs will lead to the same sorts of disparities that they purport to eliminate.

On this last point, some might retort that existing fast-track programs create the same disparity between defendants through the operation of prosecutorial discretion.  But prosecutorial decisions about the kinds of issues at stake in fast-track programs are a well-recognized feature of our criminal justice system.  Criminal prosecution is the "special province" of the Executive,[46] stemming from the President's constitutional responsibility to "take care that the Laws be faithfully executed."[47]  The Supreme Court has reminded us that "[t]he Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws."[48]  The courts are poorly situated to evaluate such factors as "the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan . . . ."[49]  All of these factors are at stake in evaluating the desirability of fast-track programs.  To be sure, criminal sentencing has traditionally been "primarily a judicial function."[50]  But the disparities resulting from fast-track programs "simply do not speak to [a defendant's] individual culpability; they do not elucidate his particular personal history or the

---

[46] *Heckler v. Chaney*, 470 U.S. 821, 832 (1985).

[47] U.S. CONST., art. II, § 3; *see* 28 U.S.C. §§ 516, 547.

[48] *United States v. Armstrong*, 517 U.S. 456, 464 (1996).

[49] *Wayte v. United States*, 470 U.S. 598, 607 (1985).

[50] *Mistretta v. United States,* 488 U.S. 361, 389 (1989) (quoting S. Rep. No. 98-225 (1983)).

circumstances surrounding his commission of the crime in any way."[51]  As a result, the Judicial Branch should be particularly reluctant to substitute its judgment for that of the popularly elected branches about what types of cases should qualify for a fast-track disposition.

For all these reasons, the court is unwilling to create its own judicial fast-track program. Mr. Perez-Chavez's motion for a downward adjustment to his sentence on this ground is, therefore, denied.

### C. The Equal Protection Claim

Mr. Perez-Chavez also argues that the selective use of the fast-track programs in some districts but not others violates the Equal Protection Clause.  The Supreme Court has stated that "although prosecutorial discretion is broad, it is not unfettered.  Selectivity in the enforcement of criminal laws is . . . subject to constitutional constraints."[52]  It is also true that "selective prosecution may constitute illegal discrimination even if the prosecution is otherwise warranted."[53]  Nonetheless, the Tenth Circuit has cautioned that "[b]ecause the exercise of prosecutorial discretion implicates a host of variables from the relative culpability of the defendants to the optimal deployment of prosecutorial resources, it is correspondingly more difficult to bring an equal protection claim than in the classic case of discrimination . . . ."[54] Therefore, "unless a law infringes upon a fundamental right or classifies along suspect lines such

---

[51]  *Armenta-Castro*, 227 F.3d at 1258.

[52]  *Wayte*, 470 U.S. at 608.

[53]  *Desi's Pizza, Inc. v. City of Wilkes-Barre*, 321 F.3d 411, 425 (3rd Cir. 2003).

[54]  *Jennings v. City of Stillwater*, 383 F.3d 1199, 1214 (10th Cir. 2004).

as race, the court's review is limited to determining whether there is a rational basis for the law."[55]

Mr. Perez-Chavez disagrees with rational basis review, contending that some sort of "compelling interest" is required to justify fast-track differences because his personal liberty is at stake. The Supreme Court has rejected this position:

> Every person has a fundamental right to liberty in the sense that the Government may not punish him unless and until it proves his guilt beyond a reasonable doubt at a criminal trial conducted in accordance with the relevant constitutional guarantees . . . . But a person who *has* been so convicted is eligible for, and the court may impose, whatever punishment is authorized by statute for his offense, so long as that penalty is not cruel and unusual . . . and so long as the penalty is not based on an arbitrary distinction that would violate the Due Process Clause of the Fifth Amendment. In this context . . . an argument based on equal protection essentially duplicates an argument based on due process.[56]

Statutes subject to rational basis review "will not be set aside on equal protection grounds if any ground can be conceived to justify them as rationally related to a legitimate government interest."[57] The burden is on the defendant to "negate every conceivable basis which might support it."[58] In this case, the rational basis for the fast-track program is clear – conserving prosecutorial and judicial resources in districts with a large numbers of immigration offenses. It

---

[55] *United States v. Angelos*, 345 F. Supp. 2d 1227, 1235-36 (D. Utah 2004).

[56] *Chapman v. United States*, 500 U.S. 453, 464-65 (1991) (citations omitted); *see also Baer v. City of Wauwatosa*, 716 F.2d 1117, 1125 (7th Cir. 1983) (discrimination against felons subject to rational basis review).

[57] *United States v. Lee*, 957 F.2d 778, 782 (10th Cir. 1992), *cert. denied*, 506 U.S. 978 (1992).

[58] *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993); *see also United States v. Angelos*, 345 F. Supp. 2d 1227 (D. Utah 2004).

does not matter whether this goal is implemented perfectly, or whether the fit between the rational basis and the statute is ideal.[59]  Under rational basis review, a statute must only be rationally related to a legitimate government interest.  The fast-track program clearly satisfies this standard.

The Supreme Court's decision in *United States v. Batchelder*[60] helpfully clarifies this conclusion.  *Batchelder* considered an equal protection challenge based on the existence of two criminal statutes prohibiting identical conduct but providing different penalties.  The defendant argued that these dual statutes gave the prosecutor unfettered discretion in deciding which charge to pursue.  *Batchelder* rejected the challenge, explaining that "[j]ust as a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution neither is he entitled to choose the penalty scheme under which he will be sentenced."[61]  Here, too, Mr. Perez-Chavez is not entitled to choose whether he will be sentenced under a fast-track or non-fast-track program.[62]

For all these reasons, the Equal Protection Clause is not implicated by the current fast-track programs and Mr. Perez-Chavez's constitutional challenge is therefore rejected.

---

[59] *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307 (1976).

[60] 442 U.S. 114 (1979).

[61] *Id*. at 125.

[62] *See also United States v. Ruiz*, 536 U.S. 622 (2002) (holding that fast-track program does not violate due process even though defendant is required to plead guilty before government has turned over potentially exculpatory information).

**D.  Concerns about Fast-Track Programs**

While the court has rejected Mr. Perez-Chavez's request for a fast-track reduction to his

sentence, the court wishes to note its concern about fast-track disparities and urge action to

reduce the geographical differences.[63]  The law and the Constitution appear to permit Mr. Perez-

Chavez to receive a different sentence because he was arrested in Utah rather than in, say,

Arizona.  But the appearance of justice is not well served when the length of time a man spends

in prison turns, without clear explanation, on the happenstance of the district in which he is

arrested.

The short term problem is the mystery surrounding how the Justice Department decides

which districts will qualify for fast-track programs.  The Attorney General has announced general

"principles" for selection – that fast-track programs will be used only where federal prosecutors

confront an exceptionally large number of specific classes of offenses which result in a strain on

resources.[64]  But these principles are pitched at such a high level of generality that they reveal

little about how decisions are actually reached.  For example, the U.S. Attorney for the District of

Utah believed that this district qualified for a fast-track program, but the Attorney General

disagreed.  At the same time, however, fast-track programs were approved for Georgia, Idaho,

---

[63] *Cf. United States v. Angelos*, 345 F. Supp. 2d at 1262 (noting circumstances in which
recommendations to the other branches of government are appropriate).

[64] Memorandum from Attorney General John Ashcroft, to All United States Attorneys,
Department Principles for Implementing an Expedited Disposition or "Fast-Track" Prosecution
Program in a District (Sept. 22, 2003).

Nebraska, Oregon and even North Dakota.[65]  North Dakota may be a "border state"; but unless it confronts some unheralded flood of illegal Canadian immigrants, it is unclear why it should operate a fast-track program while Utah (which has more illegal re-entry cases to prosecute) does not.  More information about how the Justice Department decides which districts qualify for fast-track programs might provide greater public confidence in fast-track programs.

The more general problem with fast-track programs is whether they are truly needed, or at least whether they are truly needed only in selected districts.  In this district, for example, the U.S. Attorney's Office has been able to pursue 200 to 250 immigration cases per year with only a handful of prosecutors without a fast-track program.  Presumably this is because an illegal re-entry case is easy to prove.  The elements of the offense require the prosecutor to demonstrate little more than that a defendant was found illegally present in this country.[66]  Moreover, defendants already have a significant incentive to plead guilty in order to receive credit for accepting responsibility for their crimes.[67]  Thus, it seems likely that immigration offenses could be processed rapidly even without specific fast-track credit.

More important, the reasons for handling re-entry cases differently in different districts remains elusive.  Obviously, a disproportionate number illegal re-entry cases happen along the Mexican border, and the Justice Department is free to reassign prosecutors to Mexican border

---

[65]  Sentencing Memo., Exhibit 1; Government Response to Order Directing Briefing on "Fast Track" Programs in Other Districts at 13.

[66]  *United States v. Henry*, 111 F.3d 111, 113 (11th Cir. 1997) (citing elements of illegal re-entry), *cert. denied*, 522 U.S. 894 (1997).

[67]  U.S.S.G. § 3E1.1.

districts.  Put another way, the prosecutorial caseloads for immigration offenses (that is, the number of immigration offenses handled by each prosecutor) can be essentially equalized by internal Justice Department assignment decisions.

A reallocation might not completely eliminate the need for fast-track programs, but could clearly eliminate the need for geographic differences in such programs.  For example, after a reallocation of resources, the Justice Department might need to offer only a one or two-level reduction in Guidelines sentences as part of a nationwide fast-track program, rather than the disparate offers that are made currently in different districts.[68]  Moreover, implementing a fast-track program uniformly throughout the country would, in fact, be only a modest change from current practice.  Because the districts with the most immigration-related offenses already have fast-track programs, approximately 73 percent of illegal re-entry cases are already subject to fast-track dispositions.[69]  Extending fast-track dispositions to the remaining 27 percent of offenders would return uniformity to federal prosecutions in an important class of cases and eliminate the seeming unfairness of basing a sentence on where an offender is caught.

### DOWNWARD DEPARTURE FOR EXCEPTIONAL FAMILY CIRCUMSTANCES

While Mr. Perez-Chavez is not entitled to a downward variance of his sentence for fast-track reasons, the compelling facts of his case do justify a downward departure for other reasons.

---

[68]  *See* Appendix A (recounting different approaches in different districts).

[69]  Federal Justice Statistics Resource Center *available at* http://jfsrc.urban.org/index.cfm.

Mr. Perez qualifies for a downward departure because of the exceptional circumstances in his case involving the circumstances of his family and his motivation for re-entry into the country.[70]

While "family ties and responsibilities . . . are not ordinarily relevant" in calculating a Guidelines sentence,[71] they may be relevant if "present to an unusual degree" so as to take the case outside the "heartland" of the applicable guideline.[72]   The facts of Mr. Perez-Chavez's re-entry are set forth fully above.  But several important facts bear repeating here to show why this case does not fit within the heartland of the illegal re-entry Guideline.  Mr. Perez-Chavez and his wife, Ms. Garcia-Wong, were originally deported on March 20, 2003.  His wife became pregnant shortly thereafter and immediately began suffering complications.  She was told by her doctor that her life, and that of her unborn child, were in severe danger and that her only hope was to return to the United States for medical care.  She did so, illegally, and on November 24, 2003, her baby was born three months premature and weighing less than three pounds.  Determined not to return to the United States illegally, Mr. Perez-Chavez remained in Mexico this entire time.

After she was released from the hospital, Mr Perez-Chavez's wife remained in the United States for a few months for her son to become healthy enough to where she felt it would be safe to return to Mexico.  Shortly before she was planning to leave, her grandfather became terminally

---

[70]*United States v. Carrasco*, 313 F.3d 750, 756-57 (2nd Cir. 2002).  *Cf. United States v. Hernandez-Baide*, 392 F.3d 1153 (10th Cir. 2004) (rejecting departure in illegal re-entry case for "lesser harms" but not discussing extraordinary family ties), *cert. granted on other terms*, – S.Ct. – , 2005 WL 697177.

[71]  U.S.S.G. § 5H1.6.

[72]  U.S.S.G. § 5K2.0.  *See, e.g., United States v. Bailey*, –  F. Supp. 2d – , 2005 WL 1119770 (D. Neb. May 12, 2005).

ill.  Because her mother could not care for him, the responsibility fell to Ms. Garcia-Wong, who was already caring for her own children, including the still delicate health of her newborn, Angel. When Ms. Garcia-Wong could bear her burdens no more, she called her husband and pleaded for him to come.  He did so reluctantly, reentering the country on November 1, 2004.  He did so only to help his wife with responsibilities that were overwhelming her.

The court finds that these circumstances are sufficiently atypical to remove this case from the heartland of the Guidelines.[73]  In doing so, the court notes that these same circumstances led the government to agree to a significant downward departure for Mr. Perez-Chavez's wife on the same illegal re-entry charge.  Indeed, the government also agrees that a downward departure is appropriate in this case because of the "completely unique" circumstances.

The remaining question is the extent of the downward departure.[74]  The government argues for a one-level downward departure.  The defendant urges a sentence of time served, which would amount to roughly a six-level departure.  The court believes that splitting the difference with a four-level departure is appropriate.  Because of the unique circumstances facing Mr. Perez-Chavez, his actions seem comparable to those of a minimal participant in a criminal offense.[75]  In addition, it appears that his criminal history may be somewhat over-represented.

---

[73] *See United States v. Pena*, 930 F.2d 1486, 1494-95 (10th Cir. 1991) (upholding downward departure for "unique family circumstances" where defendant was a single mother and sole provider for her two-month old child and 16-year old daughter who also had a two-month old child).

[74] *See United States v. Pool*, 937 F.2d 1528, 1533 (10th Cir. 1991) (degree of departure must be reasonable).

[75] U.S.S.G. § 3B1.2(a) (four-level reduction for "minimal" participant).

Therefore, the court will depart downward from the 18-month sentence (the low end of a level 13 and criminal history category III) to an eight-month sentence (based on the low end of a level nine and a criminal history category III).  Having considered all the purposes of sentencing and following its standard approach,[76] the court believes this is a reasonable sentence.

## CONCLUSION

The court DENIES Mr. Perez-Chavez's motion for a downward variance from the Guidelines to eliminate fast-track disparity.  The court GRANTS Mr. Perez-Chavez's motion for a downward departure due to extraordinary family circumstances.  The court will impose a sentence of eight months in prison and other conditions as listed in the judgment.

DATED this 16th day of May, 2005.


BY THE COURT:

_____
Paul G. Cassell
United States District Judge

---

[76]*See United States v. Wilson,* 950 F. Supp. 2d 910.

27

## APPENDIX A – FAST TRACK PROGRAMS

| District (Division) | Charge Bargain (Plea Bargains Rather than Departures) | 1326 Fast Track Plea Departures per § 5K3.1 USSG[77] |
|---|---|---|
| S.D. TX (Houston) | Fast Track Program approved per DOJ Further Information Unavailable | |
| S.D. TX (Corpus Christi) | Fast Track Program approved per DOJ Further Information Unavailable | |
| S.D. TX (McAllen) | none | -2 levels |
| S.D. TX (Laredo) | Fast Track Program approved per DOJ Further Information Unavilable | |
| S.D. TX (Brownsville) | none | -2 levels |
| W.D.TX (Del Rio, Alpine) | none | -1 level |
| W.D.TX (El Paso) | Fast Track Program approved per DOJ Further Information Unavailable | |
| NM | 1326(a) non agg reentry pled to a misdemeanor, 8 U.S.C. § 1325 Entry Without Inspection | -2 levels[78] |

[77]All departures identified are calculated to be in addition to the appropriate three or two level reduction for Acceptance of Responsibility per §3E1.1 USSG.

[78]Excludes defendants with a prior felony crime of violence.

28

| | | |
|---|---|---|
| AZ (Tucson) | some cases charged as 8 U.S.C. § 1325 | -3 levels for offense level 24, 20 and 16<br>-4 levels for offense level 12 and 8 if Cr Hist I thru IV (-2 levels if Cr Hist V or VI) |
| AZ (Phoenix) | some cases charged as 8 U.S.C. § 1325 | Level 24; 4 levels<br>Level 20; 3 levels<br>Level 16; 1 level<br>Levels 12 and 8; 0 levels |
| S.D. CA (San Diego) | +12 priors get 30 months (2 x 8 U.S.C. § 1325)<br>+16 priors get 30 months or 48 months depending on criminal history | 1326(a) non agg reentrys get 60 days<br>+8 priors  -2 levels<br>+16 priors that do not qualify for charge bargain get -2 levels to level 19 |
| C.D. CA (Los Angeles) | 16+ pled to 2 violations of EWI get 30 months<br>-16 priors plead to one count 8 U.S.C. § 1325 get 6 months | none |
| E.D. CA | Fast Track Program approved per DOJ Further Information Unavailable | up to 4 levels off. |
| N.D. CA | Fast Track Program approved per DOJ Further Information Unavailable | |
| N.D. Georgia | Fast Track Program approved per DOJ Further Information Unavailable | |
| Idaho | Fast Track Program approved per DOJ Further Information Unavailable | none |

| Nebraska | none | -2 levels |
|---|---|---|
| North Dakota | Fast Track Program approved per DOJ Further Information Unavailable | |
| Oregon | +16 priors get 30 mos (2 x EWI) <br> +12 priors get 24 mos <br> +8 priors get 6 mos[79] | |
| WD Washington | Plead to 1325 get 30 months | |

---

[79]Excludes individuals with prior 8 U.S.C. 1326 convictions, prior Oregon fast track participants, or other aggravating factors.